2026 IL App (1st) 251219

No. 1-25-1219

Opinion filed August 14, 2026

Sixth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| SAFE ZONE SERVICES, LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | Appeal from the Circuit Court |
| v. | ) | of Cook County. |
| | ) | |
| LINN-MATHES, INC.; RAYMUNDO RIVERA; | ) | |
| JLL CONSTRUCTION SERVICES, INC.; CIBC | ) | |
| BANK USA; ROOSEVELT-WESTERN | ) | No. 21 L 9062 |
| CURRENCY EXCHANGE, INC.; and | ) | |
| BELMONT BANK AND TRUST, | ) | |
| | ) | The Honorable |
| Defendants | ) | John J. Curry. Jr. and Johnathan |
| | ) | Clark Green, |
| | ) | Judge, presiding. |
| (Linn-Mathes, Inc.; Raymundo Rivera; JLL | ) | |
| Construction Services, Inc.; Roosevelt-Western | ) | |
| Currency Exchange, Inc.; and Belmont Bank and | ) | |
| Trust, Defendants-Appellees). | ) | |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justice Pucinski concurred in the judgment and opinion.
Presiding Justice C.A. Walker concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1 Charles Avery and Raymundo Rivera co-owned Safe Zone Services, LLC (Safe Zone),

which provides excavation and hauling services for construction sites. After their business

relationship ended, Rivera transferred his 49% membership interest in Safe Zone to Avery but

retained several construction projects, including the Emmett Project. This appeal concerns ownership of payment for over $200,000 in work Safe Zone completed before the transfer took effect.

¶ 2    Months after the transfer, Linn-Mathes, Inc. (Linn-Mathes), the general contractor on the Emmett Project, issued checks to Rivera and his employer, JLL Construction Services, Inc. (JLL), for work Safe Zone completed before the transfer. Safe Zone then sued Rivera and JLL for breach of contract, conversion, and unjust enrichment. The complaint also alleged breach of contract against Linn-Mathes and included currency exchange and a bank as defendants for negotiating the checks. Additionally, Safe Zone alleged Rivera failed to pay invoices for services Safe Zone provided to JLL.

¶ 3    The trial court granted summary judgment for defendants, finding Safe Zone agreed to transfer payments for its past work to Rivera. The court also found Linn-Mathes did not breach its contract by issuing payment to Rivera and that the financial institutions were not liable for negotiating the checks.

¶ 4    Avery argues the trial court erred in (i) granting summary judgment, (ii) vacating a default order entered against JLL, and (iii) denying his motion for attorney's fees.

¶ 5    We agree with Avery in part. The trial court erroneously equated the transfer of the Emmett Project with the transfer of payment for work Safe Zone completed before the transfer. When read together, the membership interest purchase agreement and assignment transferred the Emmett Project prospectively but did not affect compensation for labor and services Safe Zone furnished before the transfer. We therefore reverse the summary judgment in favor of Rivera and JLL and remand with instructions to enter summary judgment in favor of Safe Zone as to the ownership of the January and February checks.

¶ 6    Because the judgments in favor of Linn-Mathes and the financial institutions rested on the conclusion that Rivera owned the proceeds, we reverse those judgments and remand for further proceedings consistent with this opinion.

¶ 7    Finally, we affirm the order vacating JLL's default. We lack jurisdiction to review the denial of attorney's fees.

¶ 8                                    BACKGROUND

¶ 9    Safe Zone, owned by Avery, provides excavation, waste removal, and traffic control services for construction sites. Rivera worked in various capacities for several construction companies, including JLL. In 2019, Avery and Rivera agreed that Rivera would acquire a 49% membership interest in Safe Zone in exchange for using his industry contacts to secure work for the company. Rivera continued working for JLL and used Safe Zone's services on numerous projects, resulting in $98,000 in unpaid Safe Zone invoices (hereinafter, open invoices).

¶ 10    In September 2020, Safe Zone entered into a subcontract agreement with general contractor Linn-Mathes to perform excavation and hauling work for a Chicago Housing Authority development known as the Emmett Project. During October and early November 2020, Safe Zone provided services on the project of $123,835 and $77,286, respectively.

¶ 11    On November 6, 2020, Rivera transferred his membership interest in Safe Zone back to Avery through a membership interest purchase agreement (MIPA) and an assignment of limited liability company membership interest (Assignment). The parties do not dispute that before they executed the MIPA and Assignment, Safe Zone had already furnished more than $200,000 in labor and services on the Emmett Project.

¶ 12    Under the MIPA, Rivera retained, and Avery waived and relinquished "all right, title, and interest in and to" several construction projects, including the Emmett Project, in exchange for $100. Rivera also agreed to indemnify and hold Avery and Safe Zone harmless against losses, damages, costs, and expenses arising from those retained projects. The MIPA does not address payment for work Safe Zone completed before November 6. Nor does the MIPA state that compensation attributable to labor and services Safe Zone had already furnished before closing would pass to Rivera.

¶ 13    Under the Assignment, Rivera transferred and assigned to Avery "all of [his] right, title, and interest in and to an undivided forty-nine (49%) interest" in Safe Zone and directed that "all future distributions and payments on account of the Membership Interest hereby assigned be paid to [Avery.]" Further, Rivera "acknowledge[d] that all amounts that [he] may otherwise be entitled to from the Company have been received." Rivera "forever waive[d] any and all rights and claims to the Membership Interest, assets of the Company, or any related interest herein."

¶ 14    Avery and Rivera later submitted a change order to Linn-Mathes transferring the Emmett Project from Safe Zone to JLL. Avery e-mailed the change order to Jamie Bell, Linn-Mathes's project manager. Bell responded with an e-mail and attachment showing that Linn-Mathes owed (i) $123,835 for October work already completed by Safe Zone, (ii) $77,286 for November work already completed by Safe Zone, and (iii) $165,037 remaining under the contract after transfer to JLL. In addition, Linn-Mathes and JLL entered into a new subcontract.

¶ 15    In December 2020, Avery e-mailed Bell requesting that Safe Zone's payments be mailed to him. Bell responded that Linn-Mathes would require a lien waiver before issuing payment.

Linn-Mathes instead sent the lien waiver to Rivera, who signed it as an authorized representative of Safe Zone and returned it.

¶ 16    Linn-Mathes then issued a check payable to Safe Zone in the amount of $123,835 for its October 2020 work (the January check). Rivera picked up the check and cashed it at Roosevelt-Western Currency Exchange, Inc. (Roosevelt-Western). In his deposition, Rivera said Avery met him at the currency exchange and endorsed the check. Avery denies doing so and claims Rivera forged his signature.

¶ 17    In February 2021, Avery e-mailed Bell, Rivera, and others again and advised Linn-Mathes that only he had authority to collect payments on behalf of Safe Zone. On February 22, 2021, Linn-Mathes e-mailed lien waivers to Avery and Rivera, stating that a joint check for $77,286 for the November 2020 work would be issued to Safe Zone and JLL. In response, Avery sent an e-mail asking that Linn-Mathes "make that check out to JLL. I'm not sure why the first payment was submitted to Safe Zone, but going forward, this next payment needs to be made directly to JLL." He later sent an e-mail to Rivera and Bell again asking that the payment be made to JLL, stating that "Safe Zone had nothing to do with the project" and that "[a]ny audits, waivers, etc[.] I won't be apart [sic] of."

¶ 18    Linn-Mathes made the $77,286 check (the February check) payable to Safe Zone and JLL jointly. Rivera picked up the February check and deposited it in a JLL account at Belmont Bank and Trust (Belmont). Rivera acknowledged in his deposition that Avery contacted him, saying he should have received both the January and February checks. Rivera told Avery that because Avery had failed to pay subcontractors, Rivera intended to keep the proceeds.

¶ 19                                    Procedural History

¶ 20      Safe Zone filed an 11-count complaint, which it later amended, naming as defendants Linn-Mathes, Rivera, JLL, CIBC Bank USA (CIBC), Roosevelt-Western, and Belmont. Safe Zone alleged conversion against Rivera for cashing both checks (count I), breach of contract against Rivera for not paying the open invoices and cashing the two checks in violation of the MIPA (count II), unjust enrichment (in the alternative) against Rivera as to the open invoices and the two checks (count III), unjust enrichment (in the alternative) against JLL as to the February check (count IV), breach of the subcontract against Linn-Mathes for issuing the checks to Rivera (count V), negligently contributing to a forged signature or alteration of an instrument in violation of the Uniform Commercial Code (UCC) (810 ILCS 5/1-101 *et seq.* (West 2020)) against Linn-Mathes (count VI), aiding and abetting Rivera's alleged conversion of the January check against Roosevelt-Western (count VII), and violation of the UCC impostor provision against CIBC (count VIII) and Belmont (count IX). The trial court entered judgment on the pleadings for CIBC, and it is not a party to this appeal.

¶ 21      Safe Zone moved to default JLL and strike its pleadings for noncompliance with a discovery deadline order. The trial court denied the motion to strike but entered default, finding that JLL had failed to certify its discovery responses. The court also struck JLL's motions for summary judgment. JLL moved to vacate the default, attaching the outstanding answers to the production request with signed attestations. Finding the discovery responses properly certified, the trial court granted the motion to vacate.

¶ 22                              Summary Judgment Motions

¶ 23      Safe Zone moved for partial summary judgment against Rivera, arguing he breached the MIPA by failing to pay (i) union fees, fuel, and expenses, (ii) the open invoices, and (iii) Safe Zone's legal expenses and costs under the MIPA's indemnification provision. The trial court

entered partial summary judgment in favor of Safe Zone for $29,416.44 for fuel and union expenses but otherwise denied its motion without prejudice, finding Safe Zone's affidavit in support of fees insufficient. Safe Zone amended its affidavit and filed two additional motions for summary judgment against Rivera on fees and costs. The court again found the affidavit lacking and denied the motions without prejudice.

¶ 24     Safe Zone also moved for summary judgment against Linn-Mathes and Roosevelt-Western. As to Linn-Mathes, Safe Zone contended the record showed "that Avery was the sole authorized representative of Safe Zone, with exclusive authority to sign waivers and receive payments," and that Linn-Mathes knew Rivera lacked authority to receive payments. Thus, Linn-Mathes' "decision to issue [the January check] to Rivera *** was a violation of their contractual and legal obligations."

¶ 25     Safe Zone contended Roosevelt-Western violated its duty "to exercise reasonable care and properly verify Rivera's authority to negotiate" by allowing Rivera to negotiate the January check without "verify[ing] Rivera's authority or authenticate Charles Avery's signature on the checks, despite knowing Avery was the sole authorized representative of Safe Zone."

¶ 26     Each defendant moved for summary judgment against Safe Zone. Rivera and JLL's motion asserted that under the MIPA, Safe Zone had "waived and relinquished all right, title and interest" in the Emmett Project and had no right to the January and February checks. In response, Safe Zone argued that under the Assignment, Rivera assigned his 49% interest in Safe Zone to Avery, including "all future distributions and payments on account of the Membership Interest," which included the January and February checks. Safe Zone also referenced an e-mail exchange where Avery asks Rivera, "So you're not going to pay the open invoices? After I paid everything on this contract? After you forged my signature on a check

made to Safe Zone twice ***." Rivera responded, "Yes, they will prosecute me, I know, but in our agreement we were to divide it equally."

¶ 27    Linn-Mathes's summary judgment motion argued its subcontract with Safe Zone did not require it to determine who had authority to accept payment for Safe Zone. Further, Safe Zone admitted that it had surrendered the rights to both checks to Rivera and e-mailed Linn-Mathes asking that the checks be made payable to JLL. Regarding the UCC claim, Linn-Mathes contended the record established no one altered or forged checks.

¶ 28    Belmont also argued that the UCC did not apply and that it had frozen the funds from the February check and offered to issue a check for the full amount to Safe Zone.

¶ 29    Roosevelt-Western moved for summary judgment and to bar testimony, arguing that Safe Zone failed to answer Roosevelt-Western's interrogatories under Illinois Supreme Court Rule 213(f)(1) (eff. Jan. 1, 2018) and should be barred from introducing witness testimony.

¶ 30    The trial court granted summary judgment for Rivera, JLL, Linn-Mathes, and Belmont. The court also granted Roosevelt-Western's motion to bar testimony but denied its motion for summary judgment without prejudice and granted leave to amend its motion. The court denied Safe Zone's summary judgment motions.

¶ 31    The court found (i) that the MIPA allocated to Rivera all rights and interests in the Linn-Mathes contract, including the January and February checks, and (ii) that Linn-Mathes's contract with Safe Zone did not prohibit giving checks to Rivera and that no "genuine issue of material fact as to whether Linn-Mathes failed to exercise ordinary care in tendering" them.

¶ 32    As to the UCC claims against Belmont, no evidence showed that Rivera "had been acting as an impostor in terms of either the issuance or creation or endorsement of either of the checks." In sum, the trial court said, "I don't see how Safe Zone can allege any damage. Safe

Zone was not entitled to any of the proceeds of either of those checks given the construction the court has made of the MIPA."

¶ 33 Roosevelt-Western amended its motion for summary judgment, arguing the decision that Safe Zone was not entitled to the January check obviated its claim against it. The trial court agreed and granted the amended motion.

¶ 34 The trial court denied Safe Zone's motions to reconsider the summary judgment orders.

¶ 35 ANALYSIS

¶ 36 Summary Judgment

¶ 37 Safe Zone contends the trial court erred in granting summary judgment to the defendants and in denying Safe Zone's motion for summary judgment regarding ownership of the January and February checks.

¶ 38 Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2024). Summary judgment remains a drastic measure and should be granted only where the moving party's right to judgment is "clear and free from doubt." *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). In determining whether a material issue of fact exists, we construe the pleadings, depositions, admissions, and affidavits strictly against the moving party and liberally in favor of the opponent. *Id.* at 131-32.

¶ 39 Contract construction and interpretation present a question of law appropriate for summary judgment. *William Blair & Co. v. FI Liquidation Corp.*, 358 Ill. App. 3d 324, 334 (2005). But when the contract's language is ambiguous, we ascertain its meaning through extrinsic evidence and summary judgment is inappropriate. *Id.* (" 'In cases involving contracts, there is

a disputed fact precluding summary judgment when the material writing contains an ambiguity which requires admission of extrinsic evidence.' " (quoting *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 272 (1992))). A contract is ambiguous if it is subject to more than one reasonable interpretation. Id. Moreover, "ambiguity in the terms of a contract must be resolved against the drafter of the disputed provision." *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 479 (1998).

¶ 40    Turning to the documents, the MIPA and Assignment were executed on the same day, by the same parties, for the same purpose, and as part of the same transaction. Accordingly, we construe them together as one agreement. *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007).

¶ 41    The trial court acknowledged this principle but effectively confined its analysis to a single sentence in section 3 of the MPA: "[Rivera] *** retains and [Avery], for himself, and on behalf of [Safe Zone] *** waives and relinquishes, all right, title, and interest in and to *** certain construction projects" including the Emmett Project." As noted, however, neither section 3 nor the remainder of the MIPA addresses how unpaid compensation for work Safe Zone completed *before* November 6 would be handled.

¶ 42    The MIPA transfers the Emmett project. It does not address who owns payment for work Safe Zone completed before the transfer. Neither the MIPA nor the Assignment expressly transfers (i) compensation for completed pre-closing work, (ii) accrued receivables, and (iii) payment rights arising from labor and services already performed. The right to payment usually arises when the work is performed, even though payment may not be made until later. See *Evans & Associates, Inc. v. Dyer*, 246 Ill. App. 3d 231, 239 (1993) (builder who substantially performs in workmanlike manner is entitled to payment for contract price less offset for defects); see also Restatement (Second) of Contracts § 237(d) (1981) (contractor who

has substantially performed has claim for unpaid balance). This omission is significant because the MIPA specifically allocates payroll obligations, open invoices, indemnification, fuel expenses, and other financial rights and obligations. Had the parties intended to transfer compensation for completed pre-closing work, they knew how to say so. They did not. To the extent uncertainty remains, the documents are construed against the drafter, Rivera's counsel. See *Dowd & Dowd, Ltd.*, 181 Ill. 2d at 479; see also *Set Environmental, Inc. v. Power Cartage, Inc.*, 2022 IL App (1st) 211403, ¶ 29 ("ambiguity in the terms of a contract will be construed against the drafter").

¶ 43    Yet nowhere in either agreement is there mention of the transfer of more than $200,000 attributable to work Safe Zone had already completed before November 6.

¶ 44    The Assignment transferred all of Rivera's interest in Safe Zone back to Avery and directed that "all future distributions and payments on account of [Rivera's] Membership Interest" be paid to Avery. Rivera further acknowledged that "all amounts that Assignor may otherwise be entitled to from [Safe Zone] have been received" and forever waived "all rights and claims to the Membership Interest, assets of [Safe Zone], or any related interest herein."

¶ 45    These provisions are not surplusage. A contract should be construed so that no term is rendered meaningless. *Thompson v. Gordon*, 241 Ill. 2d 428, 442 (2011). The trial court construction gives dispositive effect to the retained-project language while giving no effect to these provisions of the Assignment. We decline to read the agreements in isolation, rendering portions of the Assignment meaningless. See *id.*

¶ 46    By November 6, Safe Zone had already completed more than $200,000 in work on the Emmett Project. The January and February checks compensated that work. The trial court focused on when Linn-Mathes issued payment rather than when Safe Zone performed the

underlying labor and services. Construction projects create value when work is performed, not months later when accounting departments process paperwork and issue checks. Nothing in the MIPA or Assignment transformed compensation for completed pre-closing work into a post-closing project asset.

¶ 47    The trial court concluded that because Rivera retained the Emmett Project, he necessarily retained the January and February checks as well. Nothing in either the Assignment or MIPA states that compensation already earned before closing became part of the Emmett Project transferred to Rivera. The MIPA transferred the Emmett Project and the remaining contractual rights associated with it. The Assignment simultaneously transferred Rivera's membership interest to Avery, directed future distributions and payments to Avery, acknowledged that all amounts otherwise owed to Rivera had been paid, and waived claims to Safe Zone assets and related interests.

¶ 48    The trial court treated transfer of the project as synonymous with transfer of compensation for work performed before the transfer date. That confuses the timing of payment with the timing of performance. The subsequent issuance of checks did not alter when the value arose. Because the MIPA and Assignment are unambiguous when construed together, we do not consider the parties' later communications or conduct in interpreting them. See *Richard W. McCarthy Trust v. Illinois Casualty Co.*, 408 Ill. App. 3d 526, 535 (2011) ("[i]f the language of a contract is clear and unambiguous, the intent of the parties must be determined solely from the language of the contract document"). Avery's later e-mails, Bell's understanding of the transaction, and the parties' post-closing conduct cannot vary the terms of the written agreements. See *id.*

¶ 49      We find that the trial court erred in granting summary judgment in favor of Rivera and JLL. For the same reason, the trial court erred in denying Safe Zone's motion for summary judgment regarding ownership of the January and February checks. We reverse the judgment in favor of Rivera and JLL and remand with directions to enter summary judgment in favor of Safe Zone on ownership of the proceeds of the January and February checks.

¶ 50      As to the claims against Linn-Mathes, Roosevelt-Western, and Belmont, the trial court entered judgment in their favor based solely on its conclusion that Rivera owned the proceeds of the checks. Because that conclusion was incorrect, those judgments cannot stand. Whether those defendants exercised ordinary care, acted reasonably, or possessed defenses independent of ownership remains for resolution on remand.

¶ 51                  Order Vacating JLL's Default

¶ 52      Safe Zone argues the trial court erred in vacating JLL's default because it still has not complied with the trial court's discovery order.

¶ 53      The decision to vacate a default judgment is within the trial court's discretion, and we will not reverse it absent an abuse of that discretion. *Glover v. Fitch*, 2015 IL App (1st) 130827, ¶ 29. Safe Zone has not established that the circuit court abused its discretion in vacating the default against JLL and reinstating its summary judgment motion. The trial court entered default against JLL due to insufficient discovery responses. JLL then supplemented the responses and moved to vacate the default. The court agreed JLL had cured the deficiencies by providing signed attestations to the discovery responses. Safe Zone does not dispute that JLL provided new attestations. Instead, it raises additional issues as to the substance of JLL's responses. Those issues do not provide a basis to reversal, as the trial court could reasonably have concluded that the supplemental responses sufficiently cured the issues with the initial

discovery responses. If Safe Zone disagrees, it can raise those discovery issues again on remand.

¶ 54        Safe Zone also argues the trial court should have struck JLL's pleadings because Rivera procured JLL's attorney without authorization. Specifically, Safe Zone contends Rivera did not own or manage JLL and had no authority to retain counsel for the company. Safe Zone asserts that absent authority to retain counsel, the attorney's acts are a nullity.

¶ 55        This argument fails because Safe Zone does not have standing to raise it. "A party does not have standing to challenge opposing counsel's ability to represent a client without some showing that the representation adversely affects interests of the party challenging opposing counsel's representation." *In re Estate of M.L.*, 2018 IL App (3d) 170712, ¶ 27. Safe Zone does not explain how JLL's current counsel adversely affects Safe Zone's interests and, thus, lacks standing to raise the argument.

¶ 56                                      Attorney's Fees

¶ 57        Safe Zone contends the trial court erred in denying its motions for attorney's fees against Rivera under the indemnification provisions of the MIPA and Assignment. Safe Zone asks that we enter partial summary judgment and make a directed ruling awarding it $433,951 in attorney's fees.

¶ 58        This court only has jurisdiction over final orders, unless specifically authorized by supreme court rules. *Hawes v. Luhr Brothers, Inc.*, 212 Ill. 2d 93, 106 (2004). Orders denying a motion for summary judgment are generally not appealable because they are interlocutory in nature and not final. *In re Estate of Funk*, 221 Ill. 2d 30, 85 (2006). The trial court denied Safe Zone's motions for summary judgment against Rivera on attorney's fees, without prejudice. Those orders are not final. Accordingly, we lack jurisdiction to address them.

¶ 59          Affirmed in part and reversed in part; cause remanded.

¶ 60          JUSTICE WALKER, concurring in part and dissenting in part:

¶ 61          I agree with the majority's decisions to affirm the circuit court's lift of JLL's default and find that we lack jurisdiction to review Safe Zone's attorney's fees claim. However, I respectfully dissent from the majority's conclusion that the MIPA and Assignment did not unambiguously assign all rights to the January and February Checks to Rivera.

¶ 62          I would find that the MIPA and Assignment, read together, unambiguously assigned all rights to the January and February Checks to Rivera, and as such, Safe Zone cannot establish (1) the wrongdoing element of conversion and (2) the damages element of breach of contract or any purported UCC-based cause of action.

¶ 63          Section 3 of the MIPA is clear and unambiguous. In exchange for ceding his 49% interest in Safe Zone to Avery, Rivera received all rights and interests in the three retained projects, including the Emmett Project. This grant is unqualified and expressly includes rights and interests previously accrued. Intent is made obvious by the use of the term "relinquish," which makes it unquestionable that the parties intended to transfer any existing right or interest that Safe Zone had in the Emmett Project (for instance, the rights to the January and February checks as acknowledged by Avery), and not just rights and interests it could accrue moving forward. See *Relinquishment*, Black's Law Dictionary (12th ed. 2024) ("The abandonment of a right or a thing.").

¶ 64          The majority's analysis centers on the Assignment's language that "all future distributions and payments on account of the Membership Interest hereby assigned be paid to [Avery]" and Rivera "acknowledge[d] that all amounts that [he] may otherwise be entitled to from the Company have been received," finding that this language can be interpreted as Rivera

conceding he was not owed the outstanding payments from the Emmett Project, and noting that the circuit court appears to have failed to interpret the Assignment at all. Even if the circuit court did so err, it does not alter this court's ability to affirm the court while considering the MIPA and Assignment together in full. See *Midwest Electronics Gaming, LLC v. Illinois Gaming Board*, 2025 IL App (1st) 241076, ¶ 26. And the text of the MIPA and Assignment, taken together, unambiguously transfers everything to do with the Emmett Project to Rivera. If the retained projects are interpreted as part of Rivera's "Membership Interest" (as referenced in the Assignment) such that Avery is still entitled to the payments from the retained projects, Rivera would effectively receive nothing by virtue of the retained project provision; he would instead simply have to transfer anything he received from the retained projects back to Safe Zone. Such a circular arrangement, in which the MIPA and Assignment contradict each other, leads to an obviously absurd result, which this court must interpret the MIPA to avoid. See *Stonegate Insurance Co. v. Smith*, 2022 IL App (1st) 210931, ¶ 37.

¶ 65 The majority is correct that the Assignment is not mere surplusage, but we have a fundamental disagreement on its implications. When the Assignment is considered alongside section 3 of the MIPA, the plain and ordinary meaning is that the retained projects now belong to Rivera separately and exclusively. They are unrelated to Rivera's "Membership Interest." *Kuhn v. Owners Insurance Co.*, 2024 IL 129895, ¶ 31. Whatever other assets or outstanding payments Rivera may have ceded his rights to by virtue of the Assignment expressly excluded his rights to everything pertaining to the Emmett Project, and it is this primary consideration on which I base my conclusions.

¶ 66 I also disagree with the majority's conclusion that because the MIPA does not expressly transfer the amounts due as reflected in the January and February checks, we cannot interpret

it as affecting such a transfer. This construction is belied by the plain language of both documents, read together. Section 3 of the MIPA expressly transferred everything to do with the Emmett Project, past, present, and future, with no limitations or qualifications. As the majority states, when the parties wanted to be specific in the contract, they were. But on this point, the agreement broadly assigns to Rivera everything related to Emmett including the right to receive the payments reflected in the January and February checks.

¶ 67    I note that Safe Zone argued in its briefing that even if this court disagreed with its interpretation of the MIPA and Assignment, we should still remand for the fact finder to consider e-mails and other extrinsic evidence to determine whether the parties intended to transfer the rights to the January and February checks to Rivera via those documents. I reject this argument because, as explained above, there is no ambiguity in the absolute and all-encompassing language in the MIPA and Assignment regarding the Emmett Project that would make consideration of extrinsic evidence proper. See *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462-63 (1999). I further note that given the state of the record—which, as the majority acknowledges, includes an e-mail in which Avery stated to Linn-Mathes personnel, as to the February check "make that check out to JLL. I'm not sure why the first payment was submitted to Safe Zone, but going forward, this next payment needs to be made directly to JLL," and later, "Safe Zone had nothing to do with the [Emmett] project," examination of extrinsic evidence might not be as strong an argument as Safe Zone anticipates.

¶ 68    Finally, though I would affirm summary judgment on most counts, I would reverse and remand on Safe Zone's "open invoices" claim. The record shows that the purported invoices, the authenticity of which Rivera does not challenge, were for work unrelated to the Emmett Project. It follows that the retained project issue does not resolve the open invoices claim.

Despite this fact, and despite Safe Zone emphasizing this in its motion to reconsider, the circuit court maintained its blanket dismissal of counts II and III without any substantive consideration of the open invoices. Based on this record, I would find that summary judgment should not have been granted on the open invoice aspect of counts II and III, and remand for further proceedings on that narrow issue, as Rivera did not demonstrate there was no issue of material fact on whether he owed payment on these invoices. See *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 49. Rivera's lone rejoinder is that Safe Zone failed to clarify that the open invoices were unrelated to the Emmett Project. This is belied by the record, as the invoices themselves are labeled as pertaining to other projects and dated as occurring before the Emmett Project began. To the extent Rivera argues he does not actually owe the amounts listed in the invoices, or other evidence indicates the invoices are invalid, he would have the chance to litigate such factual issues on remand.

¶ 69     For these reasons, I would affirm the circuit court's grant of summary judgment on counts I, IV, V, VI, VII, and IX of the third amended complaint, thereby fully resolving all claims against defendants JLL, Linn-Mathes, Roosevelt-Western, and Belmont; I would also affirm the grant of summary judgment on counts II (breach of contract) and III (unjust enrichment) insofar as those counts seek damages from Rivera arising from the January and February checks. However, I would remand solely for further proceedings on the allegations in counts II and III concerning the open-invoice claim against Rivera.

¶ 70     Because I disagree only with the majority's disposition of counts II and III, I respectfully dissent in part.

---

*Safe Zone Services, LLC v. Linn-Mathes, Inc.*, 2026 IL App (1st) 251219

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 21-L-9062; the Hon. John J. Curry Jr. and the Hon. Johnathan Clark Green, Judges, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Christopher Keleher, of The Keleher Appellate Law Group, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Marisa K. Perry, of Harris Winick Harris LLP, of Chicago, for appellee Linn-Mathes, Inc. |
| | Mark Jacobson, of Chicago, for appellees Raymundo Rivera and JLL Construction Services, Inc. |
| | Marty J. Schwartz and Benjamin T. Weber, of Schain, Banks, Kenny & Schwartz, Ltd., of Chicago, for appellee Roosevelt-Western Currency Exchange, Inc. |
| | Riccardo A. DiMonte and Dominic G. Erbacci, of Robbins DiMonte Ltd., of Park Ridge, for other appellees. |

---